IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 25-cr-00077-JLK-04

UNITED STATES OF AMERICA,

Plaintiff,

v.

4. YENDER ENRIQUE CAMPOS-MALAVE,
a/k/a "El Flaco"

Defendant.

# PLEA AGREEMENT

The United States of America (the government), by and through Leah Perczak, Assistant United States Attorney and Garreth Winstead, Deputy United States Attorney for the District of Colorado, and the defendant, Yender Enrique Campos-Malave, personally and by counsel, R. Scott Reisch, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

## I. AGREEMENT

**Defendant's Agreement:**

The defendant agrees to:

(1) plead guilty to Attempted Kidnapping, a lesser included offense of Count 1 of the Indictment, in violation of 18 U.S.C. § 1201(d);

(2) waive certain appellate and collateral attack rights, as explained in detail below.

COURT EXHIBIT
1

**Government's Obligations:**

The government agrees to allow the defendant to plead guilty to Attempted Kidnapping, a lesser included offense of Count 1 of the Indictment.

Provided the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b).

If the defendant engages in conduct which implicates USSG §§ 3C1.1 cmt. n.4 between the guilty plea and sentencing in this case, in addition to any other consequences, the government will be released from its obligations under the plea agreement, and the defendant will not thereby have any right to withdraw from the plea agreement.

**Defendant's Waiver of Appeal:**

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

(1) the sentence exceeds the maximum sentence provided in the statute of conviction;

(2) the government appeals the sentence imposed.

If the first criterion applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if the second criterion applies, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2) the defendant was deprived of the effective assistance of counsel; or

(3) the defendant was prejudiced by prosecutorial misconduct.

The United States agrees not to argue a procedural bar to a prosecutorial misconduct claim raised in a § 2255 petition based on the failure of the defendant to raise that issue on direct appeal.

The Defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The Defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

## II. ELEMENTS OF THE OFFENSE(S)

The parties agree that the elements of Attempted Kidnapping are as follows:

**Count One: 18 U.S.C. § 1201(a)(1) and (d)**

*First:* the defendant, knowingly acting contrary to law, attempted to kidnap the person described in the indictment by seizing, confining, abducting and holding for ransom him as charged;

*Second:* the kidnapping was done for some purpose or benefit; and

*Third:* the defendant used a means, facility or instrumentality of interstate or foreign commerce in committing the offense.

10th Circuit Criminal Pattern Jury Instructions 2021 Edition

## III. STATUTORY MAXIMUM SENTENCE

The maximum sentence for Attempted Kidnapping, the lesser included offense of Count 1 of the Indictment is: not more than 20 years imprisonment; maximum term of supervised release of three years; maximum fine of $500,000; $100 mandatory victim's fund assessment fee.

## IV. COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.

The defendant is likely to be deported and removed from the United States, or confined indefinitely if there is no country to which the defendant may be deported, denied future admission into the United States, and/or to be denied citizenship. Any status the defendant has within the United States is likely to be revoked.

## V. STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate that the government would be able to prove the following facts at trial.

On October 16, 2024, the Denver Police Department received a welfare call reporting that someone had been kidnapped at 535 S. Hazel Court in Denver, Colorado. This address is within the state and federal district of Colorado. Officers responded to the location at 10:30 p.m. and conducted a limited visual search of the residence. Officers observed co-defendant, Jefferson Balza-Delfin hiding underneath the covers of a child's bed in one of the bedrooms, who identified himself by name to officers. Inside the residence, officers also contacted co-defendant Darwin Veliz-Gonzalez. During the welfare check, officers did not see any person in distress, although they did not check every bedroom in the residence.

On October 17, 2024, a person with initials L.G.-M. walked into a Denver police station at approximately 8 a.m. to report that he had been the victim of a kidnapping and assault that occurred at 535 S. Hazel Court in Denver, Colorado. L.G.-M. showed officers that he was

missing the pinky finger from his right hand and told officers that during the kidnapping, his finger had been severed by the kidnappers.

L.G.-M. had been living at 535 S. Hazel Court for about a month and had been paying to rent a room within the house. L.G.-M. stated that four of his roommates had kidnapped, tortured and assaulted him. L.G.-M. identified the men by their nicknames, "El Negro," "Gocho," "Flaco," and "Escopeta." L.G.-M. said that the incident began when "Gocho," borrowed his cellphone and saw a photograph of L.G.-M.'s father in a Venezuelan police uniform. The men asked L.G.-M. if his father was a police officer in Venezuela, and L.G.-M. confirmed that he was. L.G.-M. had also worked as a police officer in Venezuela. In response to this information, the four men, including the defendant, kidnapped L.G.-M. in his bedroom and tied him up with rope. L.G.-M. was held without food and very little water for several days. On October 16, 2024, the men began to torture L.G.-M. and filmed their acts in order to send ransom demands to L.G.-M.'s wife and family in Venezuela.

"Gocho," "El Negro," "Flaco" and "Escopeta" each participated in assaulting and torturing L.G.M. During the course of the kidnapping, the defendant contacted international leadership of the Tren de Aragua (TdA) gang and consulted with the gang leaders about the kidnapping. As part of the phone call, the group decided on a ransom amount and began to torture L.G.-M. in an attempt to secure the ransom payment. The group strangled L.G.-M. with a rope until he nearly lost consciousness and filmed it on a cellphone. The group also attempted to drown L.G.-M. by holding his head in a bucket of water for 30 seconds or more at a time, repeatedly. This was also filmed on a cellphone. L.G.-M. was also struck in the head or "pistol whipped" and threatened with a firearm. These videos were sent to L.G.-M.'s wife along with ransom demands for $30,000 for L.G.-M.'s release via cellphone. The videos were also sent to

TdA leaders via cellphone, who assisted in demanding money from L.G.-M.'s family. No ransom was paid at any point during the kidnapping. The defendant maintained contact with TdA leadership throughout the course of the kidnapping.

When L.G-M.'s family did not pay the ransom demand, L.G.-M. overheard the four men discussing cutting off one of his fingers. L.G.-M. heard one male say, "I'll do it," then co-defendant Balza-Delfin came into the room with the other co-defendants. Co-defendant Balza-Delfin used a pair of pliers to cut off L.G.-M.'s pinky finger, which was also filmed. L.G.-M. was bleeding heavily for several hours and experienced severe pain. Throughout the course of the torture of L.G.-M., the four co-defendants wore gloves and changed their gloves frequently. All of their clothing, gloves and the bloody bandages from L.G.-M.'s wounds were thrown away.

L.G.-M. was still tied up when the men heard the police arrive on October 16, 2024, to conduct the welfare check at the residence. L.G.-M. was hidden in a room inside the house and was too afraid to make himself known to law enforcement when they arrived. A few hours after police conducted the welfare check, the group discussed driving L.G.-M. to the mountains to kill him, but instead, "Escopeta," "El Negro," "Gocho" and "Flaco" fled the residence. L.G.-M. was able to escape from the house and contact a friend to seek help from the police.

"Escopeta" was identified as Darwin Veliz-Gonzalez by L.G.-M. and others. "El Negro" was identified as Jose Pineda-Moreno by L.G.-M. and others. "Gocho" was identified as the defendant, Jefferson Balza-Delfin by L.G.-M. and others. "El Flaco" was identified as Yender Campos-Malave by L.G.-M. and others. On October 17, 2024, investigators utilized an emergency ping to locate L.G.-M.'s cellphone, which he believed the four men had taken with them when they fled the house on South Hazel Court. L.G.-M.'s phone appeared to be located near 3703 West Walsh Place in Denver, Colorado. Officers responded to that location and

observed two vehicles that were also seen in front of 535 South Hazel Court during the welfare check on October 16, 2024. The defendant was contacted at 3703 West Walsh Place and appeared to be doing construction work on the house. Jose Pineda-Moreno and Jefferson Balza-Delfin were also contacted at the same location. Officers located L.G.-M.'s cellphone in a bush at 3703 West Walsh Place and two other cell phones in a dumpster in front of that address. Analysis of L.G.-M.'s cellphone revealed a latent print on the device which was determined to match Jefferson Balza-Delfin.

L.G.-M. identified the defendant via photograph and confirmed that the defendant was the person he knew as "El Flaco," who had participated in his kidnapping and torture. The defendant and his co-defendants utilized a facility of interstate and foreign commerce during the kidnapping, namely, a cell phone.

## VI. ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the government may argue that facts identified in the presentence report, or otherwise identified

during the sentencing process, affect the estimate below.

a) Under Section 2A4.1(a), the base offense level is 32.

b) Under Section 2A4.1(b)(1), there is a six-level increase as a ransom demand was made.

c) Under Section 2A4.1(b)(2), there is a four-level increase as the victim sustained permanent injury.

d) Under Section 2A4.1(b)(3), there is a two-level increase as a dangerous weapon was used.

e) The adjusted offense level is 44.

f) Under Section 3E1.1, the defendant should receive a three-level decrease for timely acceptance of responsibility.
The resulting total offense level is 41.

g) The parties understand that the defendant's criminal history computation is tentative and based on the defendant's prior convictions. The parties believe the defendant is in criminal history category I.

h) The career offender/criminal livelihood/armed career criminal adjustments do not apply.

i) The advisory guideline range resulting from these calculations is **324-405** months. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level(s) estimated above could conceivably result in a range from **324-405** months (bottom of Category I) to **360 months – life imprisonment** (top of Category VI). The guideline range would not exceed, in any case, the cumulative statutory maximums applicable to the counts of conviction.

j) Pursuant to guideline § 5E1.2, assuming the estimated offense level above is correct, the fine range for this offense would be $ 50,000 to $500,000, plus applicable interest and penalties.

k) Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term must be at least one but not more than three years.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in

the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII. ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

Date: 4/3/26

Yender Enrique Campos-Malave
Defendant

Date: 4/3/26

R. Scott Reisch
Attorney for Defendant

Date: 4/6/26

Leah Perczak
Assistant U.S. Attorney