**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 25-cr-00077-JLK-01

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. DARWIN VELIZ-GONZALEZ,
a/k/a "Escopeta,"

Defendant.

---

**UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT, [Doc. 130]**

---

The United States of America, by Peter McNeilly, United States Attorney for the District of Colorado and through Leah Perczak, Assistant United States Attorney, hereby responds to the Defendant's Objections to the Presentence Investigation Report, [Doc. 130]. The defendant objects to a two-level enhancement pursuant to the United States Sentencing Guidelines Section 3B1.1(c), for having an aggravated role in the offense. The defendant additionally objects to references to Tren de Aragua gang affiliation. Finally, the defendant provides clarifications or additional information to several sections of the Presentence Investigation Report (PSR). Each will be addressed in turn.

## I. OBJECTIONS THAT IMPACT THE ADVISORY GUIDELINE RANGE

### A. Aggravated Role Enhancement

The defendant objects to a two-level enhancement under U.S.S.G. § 3B1.1(c) for his aggravated role in the offense. This objection should be overruled as the defendant was an organizer, leader, manager or supervisor of one or more other participants in this offense.

A two-level enhancement applies where "the defendant was an organizer, leader, manager or supervisor in any criminal activity." U.S.S.G § 3B1.1(c). In considering whether the defendant occupies a leadership and organization role or mere management and supervision, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. USSG § 3B1.1, comment (n.2). Further, the Court should consider "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of fruits of the crime, the degree of participation or planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." USSG § 3B1.1, comment (n.4).

The defendant contends that he merely witnessed his co-defendants kidnap and torture the victim, L.G.-M., and denies providing a weapon to be used during the torture of the victim. Doc. 130, ¶¶ 20 -26. The defendant claims, in essence, that he was merely in the wrong place at the wrong time, alleging that he had no communication with the Tren de Aragua leaders who participated in the kidnapping from outside the United states, and claims that he did not participate in any conversations about the kidnapping. *Id.*

The defendant's assertions are without support and are directly contradicted by the statements of witnesses. Victim L.G.-M. was interviewed by law enforcement several times, once immediately after he escaped his captors and sought the help of police. L.G.-M. stated that he had been renting a room from Karen Soto, the defendant's wife, and that the defendant had been living in the basement room he shared with his wife. Doc. 125 at ¶ 18. L.G-M. stated that after the four defendants discovered that he had been a police officer in Venezuela, they cornered him inside the home and kidnapped him by moving him into a bedroom on the main level of the home and tying him up. *Id.* at ¶ 20. L.G.-M. described that the defendant and co-defendants

Pineda-Moreno, Campos-Malave and Balza-Delfin each participated in the torture that followed his kidnapping. *Id.* at ¶ 21. L.G-.M. stated that the defendants tortured him repeatedly over the course of many hours, frequently video-taping the torture and sending the videos to L.G.-M.'s wife with ransom demands for L.G-M.'s release.

L.G.-M. told law enforcement that the co-defendants tied a rope around his neck, made him sit on the floor near his bed, and strangled him by standing above him and holding the rope. *Id.* L.G.-M. described that despite videos of this strangulation being transmitted to his family in Venezuela, the ransom demands were not paid. L.G.-M. told law enforcement that the defendant handed a black handgun to the other co-defendants and instructed them to beat L.G.-M. with the gun. *Id.* L.G.-M. stated that he was struck with the handgun by the co-defendants and then threatened with the gun, as the defendants told him they would kill him. *Id.* L.G.-M. told law enforcement that he knew that the defendant owned the gun that he had given to the co-defendants and heard the defendant giving the other men instructions about how to torture L.G.-M. *Id.* at ¶ 23.

Over the course of several hours, L.G-M. was strangled, beaten with the defendant's handgun, drowned in a bucket of water, and mutilated. L.G.-M. described that as the ransom demands were not paid, he overheard the defendants discussing cutting off one of his fingers. L.G.-M. heard co-defendant Balza-Delfin say "I'll do it," and walked into the room where L.G.-M. was tied. *Id.* at ¶ 14. L.G.-M. further described that the defendant handed pliers to co-defendant Balza-Delfin and instructed him to cut L.G-M.'s finger off. *Id.* at ¶ 23. Balza-Delfin heeded the defendant's instructions and ultimately cut off one of L.G.-M.'s fingers with the pliers. L.G.-M. described that it took Balza-Delfin several tries to cut his finger off and that he was bleeding heavily from the various wounds inflicted at the defendant's direction.

After his finger had been severed, L.G.-M. was brought into the kitchen area of the defendant and Ms. Soto's home and was seated at the kitchen table. L.G.-M. described that when Ms. Soto saw that he was pale, she asked the defendant to give L.G.-M. some food to eat because she thought he would die. Shortly thereafter, members of the Denver Police Department arrived at Ms. Soto's house to conduct a welfare check and the defendant was arrested on an unrelated warrant. *Id.* at ¶ 24.

In contrast to the defendant's claims that he was merely an observer his co-defendants' actions, the defendant was a leader and supervisor of the brutal torture and mutilation of L.G.-M. As an initial matter, the defendant is more than a decade older than his co-defendants, which, while certainly not dispositive of the defendant's role as a leader, gave the defendant authority over the far younger co-defendants. Further, the defendant's wife rented the home where many of the co-defendants and L.G.-M. were living, elevating his position as an authority figure within the home. The defendant used his authority to dictate how L.G.-M. was tortured and repeatedly insisted the group use more violence to achieve the goal of the kidnapping and secure a ransom from L.G.-M.'s family.

L.G.-M. was clear and without doubt when he described how the defendant gave a gun to the co-defendants and ordered them to use it on L.G.-M. Similarly, L.G.-M. recalled clearly that the defendant gave the pliers to Balza-Delfin when the group agreed that they should cut off one of L.G.-M.'s fingers. The defendant therefore demonstrated control over his co-defendants, and is responsible for the actions of his co-defendants. *See United States v. Levine,* 983 F.2d 165, 168 (10th Cir. 1992) ("To find that a defendant was an organizer or leader under § 3B1.1, we consider the defendant's recruitment of accomplices, control over accomplices, organizing the enterprise and exercising decision-making authority." Here, when the defendant gave instructions during

the kidnapping, his co-defendants obeyed, demonstrating his control and authority over them. *See United States v. Bauer,* 995 F.2d 182, 183-84 (10th Cir. 1993), (upholding enhancement under § 3B1.1(c) because the defendant was both an organizer and a controller of a criminal scheme).

While the defendant denies directing his co-defendants in the torture of L.G.-M. and attempts to distance himself from their actions, L.G.-M.'s clear description of the defendant's role as a leader in the kidnapping supports the application of the two-level enhancement. The defendant's objection should be overruled.

## II. OBJECTIONS THAT DO NOT IMPACT THE ADVISORY GUIDELINE RANGE

The defendant raises a number of objections and clarifications to the Presentence Investigation Report that do not affect the advisory guideline range. As such, the Court need not resolve the defendant's objections or clarifications. Fed. R. Crim. P. 32(i)(3)(B).

### A. Gang Membership Designation

The defendant objects to references to his affiliation with the Tren de Aragua (TdA) gang within the Presentence Investigation Report (PSIR). The defendant asserts that he is not a member of TdA and was not a member during the kidnapping and torture of L.G.-M. Doc. 130. The defendant's arguments are unavailing, given the evidence that this kidnapping was done in coordination with, and at the behest of international TdA leadership.

L.G.-M. described that while he was kidnapped, the defendants had repeated video calls with "Chino San Vicente," during which L.G.-M. was able to overhear and see "Chino San Vicente" discussing the kidnapping and ransom demands. "Chino San Vicente" is a known alias of TdA leader Brawins Dominique Suarez-Villegas. Suarez-Villegas is a high-level TdA leader responsible for TdA activity in Bogota, Colombia. Suarez-Villegas maintained contact with a

number of TdA associates from Colombia who made their way to the United States, and is known to have directed TdA activity within the United States.

L.G.-M. described that Suarez-Villegas was on multiple video calls with the defendants while he was kidnapped, and that Suarez-Villegas told the defendants to cut off one of his fingers to better assist the ransom demands. Further, L.G.-M. described that at one point, Suarez-Villegas spoke directly with L.G.-M. and told him that if his family did not pay the ransom, he would be killed. L.G.-M. believed that all four defendants were members of TdA, based on their access to Suarez-Villegas and his involvement.

Investigators executed search warrants on multiple cell phones seized in this investigation. On co-defendant Campos-Malave's cellphone, investigators located a saved contact named "Chino San Vicente." Law enforcement was able to corroborate that Campos-Malave had contact with Suarez-Villegas or "Chino San Vicente," because Campos-Malave sent a text message from his phone to "Chino San Vicente," wishing him a happy birthday on Suarez-Villegas' actual birth date.

L.G.-M. further described that he knew the "Chino San Vicente" that he saw on video calls during his kidnapping was in fact Suarez-Villegas, because he saw news footage of Suarez-Villegas being arrested in Colombia many months after his kidnapping, and recognized him as "Chino San Vicente."

While the defendant denies any involvement with TdA, the defendant and his co-defendants had ready access to an international leader of TdA. Further, Suarez-Villegas participated in the kidnapping by instructing the defendants on what to do and how best to secure a ransom from L.G.-M. and his family. L.G-M. witnessed the conversations between the defendants and Suarez-Villegas firsthand, and recalled Suarez-Villegas' face many months later

when he saw him on the news. The defendant's assertion that he has never been affiliated with TdA is directly contradicted by the fact that Suarez-Villegas was in contact with the defendants during the kidnapping and that the group took orders from Suarez-Villegas. The defendant's objection to the description of his gang affiliation should be overruled.

**B. Clarification to Paragraph 5**

The government takes no position as to the defendant's clarification. The PSIR has been updated to reflect the defendant's position.

**C. Clarification to Additional Information Section**

The PSIR has been updated to reflect the fact that L.G.-M. rented a room from the defendant's wife, and the government agrees with this updated description. The defendant maintains his denial that he provided a gun to co-defendant Campos-Malave to use on L.G.-M. The government has no additional information to provide, and incorporates its arguments as to the defendant's aggravated role in the offense.

**D. Objection to Justification**

The defendant objects to the PSIR referencing the defendant's prior, dismissed domestic violence charges in its justification for the recommended sentence. This Court can determine what weight, if any, to give the dismissed domestic violence charges. The PSIR does not misstate any fact related to the domestic violence incident that resulted in these charges, and the defendant does not challenge the factual accuracy. The PSIR does not place undue weight on the defendant's dismissed charges and provides ample justification for the recommended sentence.

//

Respectfully submitted,

PETER MCNEILLY
United States Attorney

*s/ Leah Perczak*

By: Leah Perczak
Assistant U.S. Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
E-mail: leah.perczak@usdoj.gov
Attorney for the Government

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2026, I electronically filed the foregoing **UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT [Doc. 130]** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties on record.

*s/ Leah Perczak*
Leah Perczak
Assistant United States Attorney